Filed 2/21/23 P. v. Luna CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. BRYAN LUNA et al., Defendants and Appellants. | F082309 (Consolidated w/F082434) (Madera Super. Ct. Nos. MCR066495A & MCR066495B) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County. Mitchell C. Rigby, Judge.

Rex Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant, Bryan Luna.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant, William Webb.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill, and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellants and defendants Bryan Luna (Luna) and William Webb (Webb), along with codefendant Francisco Samaniego (Samaniego), confronted Kevin Goodrich in a park and assaulted him with a shovel, an axe, and a sledgehammer. Goodrich suffered fractures to his skull and face. The three defendants were charged with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)).[1]

At their joint trial, defendants did not testify but relied on the defense that Goodrich drew his knife first and provoked the incident. The three defendants were convicted as charged. As to Luna and Webb, the jury found true the enhancements that they personally inflicted great bodily injury on Goodrich in the commission of the assault (§ 12022.7, subd. (a)); the jury was unable to reach a finding on this enhancement as to Samaniego. Luna and Webb were sentenced to second strike terms of 16 years in prison.

Luna and Webb have filed appeals that have been consolidated in this case. Samaniego is not part of the instant appeal.

On appeal, Luna and Webb jointly assert there is insufficient evidence to support the great bodily injury enhancements because Goodrich was unable to testify as to which defendant inflicted which blow upon him during the assault; and the matter must be remanded for a new sentencing hearing because the court imposed upper terms based on aggravating circumstances that they did not admit and were not found true by the jury beyond a reasonable doubt, as required by Senate Bill No. 567's (2021–2022 Reg. Sess.) (Senate Bill 567) amendments to section 1170, subdivision (b) (Stats. 2021, ch. 731, §§ 1.3, 2).

Webb separately asserts the court failed to enumerate the elements of one of the fines it imposed, and the calculation of his credits must be corrected.

We will order correction of Webb's credits, find the other issues raised by Luna and Webb are not meritorious, and affirm their judgments.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

## FACTS

Around 9:30 p.m. on May 28, 2020, 62-year-old, Kevin Goodrich, was sitting at a table in the picnic pavilion area at Millview Park in Madera and getting ready to "bed down" for the night. Goodrich was homeless and had been living at the park by himself for four to six weeks. The pavilion area was very dark, and there were only lights in the adjacent parking lot.

Goodrich carried camping gear with him that consisted of a tent, sleeping bag, portable burner, and cooking utensils. He also had a backpack with his personal belongings and rode a red, 18-speed bicycle. Goodrich carried a knife to protect himself on the streets. On that night, he decided not to set up his tent, and instead placed his sleeping bag on top of a picnic table to sleep there.

**Goodrich Encounters Defendants**

Goodrich testified that Bryan "Polo" Luna, William "Will" Webb, and Francisco "Franky" Samaniego were also in the picnic area that night. They were sitting two tables away from him, about 15 to 18 feet away.

Goodrich had known Webb for over a year through the rescue mission, Luna occasionally stayed at the park, and Luna had introduced him to Samaniego. Goodrich testified that the three defendants talked among themselves, and he was not listening to their conversation.

Luna walked over to Goodrich and started to "bait" him. Luna said he did not want Goodrich to know about his business and what he was doing, he did not trust him, and he wanted Goodrich to leave. Goodrich testified that Luna sold drugs, and Luna said that he was afraid Goodrich was talking to the police. Luna said that if Goodrich did not leave, "they were going to beat me up and steal my bike and my stuff."

Goodrich testified that Luna was standing about 10 feet in front of him when he made these statements. Webb and Samaniego were about 12 feet behind Goodrich, and

3.

they moved closer to him. Goodrich did not see defendants in possession of any weapons at that time.

Goodrich testified that he pulled his folding knife from his pocket, opened the blade, and held it in his right hand because Luna was threatening him. Goodrich testified that he did not leave the picnic area because he had already set up his belongings for the night, and he wanted to stay there and defend his position.

Goodrich stepped forward, waved his knife at Luna, and thrust it forward. Luna backed away and continued to "bait" him, saying that Goodrich was too old and slow to catch him. Goodrich testified that he was not looking for a fight, but he was going to defend himself and hoped Luna would leave. Luna moved too far away for Goodrich to hit him, or he might have made a second thrust of the knife toward Luna. Webb and Samaniego did not say anything to him.

As Goodrich stepped toward Luna, Samaniego took Goodrich's bicycle and pushed it behind some shrubs, about 18 to 20 feet away. Goodrich told Luna he was not going to leave, and Luna could just as easily leave himself.

Goodrich testified that after moving the bicycle, Samaniego returned to the area where Goodrich was standing with Luna and Webb. Samaniego was carrying three construction tools: a metal shovel with a round-nosed spade, a steel axe, and a sledgehammer, all of which had long wooden handles. Samaniego kept the sledgehammer and gave the shovel to Webb and the axe to Luna.

**The Assault**

Goodrich testified that Luna, Webb, and Samaniego "converged" on him, and started "swinging" at him with the weapons they were holding. No one else was in the picnic area when defendants attacked him. Goodrich grabbed his backpack and folded tent in his left hand and used them as shields. He still held his knife in his right hand. Goodrich had to "dance" and "wheel around" because the three defendants surrounded him with their weapons.

4.

Goodrich tried to lunge at defendants with his knife, but they were able to stay away from him, and they attacked him with their long-handled tools. Goodrich did not believe he hit anyone with his knife.

**Goodrich's Testimony About Defendants' Blows**

On direct examination, Goodrich testified that he was "getting hit" by all three defendants, but "to say who with what weapon at what time hit me, I mean, I can't tell that."

> "Q      … Mr. Luna, did he have a weapon?
>
> "A      Yes.  He had the long-handled axe.
>
> "Q      And did he swing it at you?
>
> "A      Yes.
>
> "Q      And did he ever strike you?
>
> "A      Could be.  I can't tell you which weapon, you know, did what.  I mean, sometimes I had my pack up.  And, you know, their long-handled tools, they were coming over the top, you know?  It was a [melee]. I can't say … which injury was caused by what weapon.
>
> "Q      So just to clarify, you are sure that Defendant Luna had a weapon and swung it at you, but you weren't sure if that was one of the ones that you were able to successfully block or if it's one of the one you weren't able to block and it did strike you; is that accurate?
>
> "A      Yes…"

Goodrich testified that Webb had the shovel and was swinging it.

> "Q      And do you know whether or not [Webb] was successful in landing any of his strikes against you?
>
> "A      I would imagine.  He had the longest weapon.  He had the longest reach.  But, you know, it was – like I say, it was – I was having to wheel around and watch everybody and try to fend off whatever blows I could."

Goodrich testified that Samaniego had the sledgehammer, used it against him, and was "swinging it over his head."

"Q And can you tell us whether or not [Samaniego] was successful in actually landing a strike on you?

"A I can't say which one, you know … who landed what, you know, what caused what wound. I don't know. I had abrasions on my body and got my skull cracked and my face broken and my nose broken."

On further direct examination, Goodrich testified that all three defendants were swinging the tools "mostly" at his head and upper body. While he was not sure which defendant inflicted which injuries, he was sure that he was hit in the face and head multiple times, and "they were all swinging at me."

"Q … As to Defendant Luna, can you say with any certainty that you are sure he actually landed any of the blows he attempted on you?

"A Oh, yes.

"Q And to what level of certainty are you sure that he indeed successfully struck you with his weapon?

"A Oh, you mean to put a number on it?

"Q How sure are you?

"A Oh, I know he did. I can't necessarily say exactly how many.

"Q Can you estimate … how many times you are 100 percent sure that Luna struck you? [¶] … [¶]

"[A] At least two."

Goodrich was asked the same questions about Webb and testified that he was sure Webb actually landed blows on him.

"Q And how many of [Webb's] attempted blows are you 100 percent sure landed?

"A At least two.

"Q And –

6.

"A     I know it – well, probably more, but at least two, yes."

As to Samaniego, Goodrich testified that he was sure that he landed "[a]t least two" blows on him with the sledgehammer. At one point, Samaniego swung the sledgehammer and missed him. Goodrich testified that Samaniego might have hit a picnic table with his sledgehammer as concrete shards flew around, but the shards did not hit him.

On cross-examination, the defense attorneys returned to the subject of the weapons:

"Q     Who swung first?

"A     Uh, William Webb with the long-handed shovel."

Goodrich acknowledged he previously testified that he did not know who specifically hit him, that he later said each defendant hit him two times, and that "was an approximation, once to twice."

"Q     Well, was it an approximation, or was it a guess?

"A     Well, at least – you know, I am not 100 percent sure of whom hit me with all of the blows and …. which person did … each and every blow that connected with me. I do not know.

"Q     So –

"A     It was a flurry."

Goodrich explained that as he testified, he had "more clarity" about the assault because he thought about what happened, and he could be more specific. "You were asking about if I knew how many times each and every one of them delivered blows to me through that [melee]. No, I do not. I do not have a specific count on it." "The specific count as to how many times each and every one of them hit me? No, I don't know that number."

"Q     So yesterday … you could remember Mr. Webb specifically hitting you?

7.

"A     Yes.

"Q     So has that changed since yesterday?

"A     As to specific blows that did connect?  Yes, I can.

"Q     And as you sit here today, you think each of them hit you two times?

"A     Oh, yes.  At least, yes."

**The Assault Ends**

Goodrich testified that the three defendants eventually became tired, backed away, and the assault ended.  Goodrich was exhausted.  He sat down, caught his breath, announced he was leaving, and walked away from the picnic area.  Goodrich headed toward the parking lot, about 50 to 70 feet away from the scene of the assault.  The parking lot was illuminated by lights, and Goodrich thought he would be safe there.  Goodrich had his backpack and tent but left behind his other possessions in the picnic area; he did not try to find his bicycle.  Luna initially followed Goodrich into the parking lot and was "trying to hurry me along," but stopped following him when Goodrich got to the lighted area.

Goodrich kept walking until he got to an intersection.  He retrieved his cell phone from his backpack and called 911, and the police quickly arrived.

**The Police Arrive**

At 9:39 p.m., Madera Police Officer Santoyo responded and contacted Goodrich, who was sitting on a curb and appeared scared.  The top right side of his head was actively bleeding.  His face and hair were covered in blood, his right eye was swollen, and there was a laceration on the bridge of his nose.

Officer Santoyo testified that Goodrich said he had been in an altercation, gave his knife to Santoyo, and said he used it to defend himself.

Officer Santoya testified that Goodrich gave the following account of what happened and referred to the suspects by their first names.  Goodrich said that Polo (later

8.

identified as Luna) got very angry and told Goodrich if he did not hurry up and leave, he was going to have "his homeboys" beat him up, referring to Franky and Will (Samaniego and Webb). Goodrich said that he was afraid Polo, Franky, and Will were going to attack him. Goodrich pulled out his folding knife and told Polo to back up until he could get away. Polo did not have a weapon at that time but "rushed" him. Goodrich said that he swung his knife at Polo, and believed he made contact somewhere on Polo's face. After that, he was attacked by Polo, Franky, and Will. Goodrich said that it was very dark, and he could not remember who used what weapon, but he remembered being hit by a shovel, an axe, and a knife. Goodrich said that he was able to fight his way out and escape.

Officer Santoyo went to the picnic area where the assault occurred, and it was very dark and "pitch black" there. The suspects were gone, but Santoyo found an axe with blood on it and a few of Goodrich's belongings. He did not find Goodrich's sleeping bag or bicycle.

**Goodrich's Injuries**

Goodrich was taken by ambulance to the hospital that night. As a result of the assault, Goodrich suffered fractures to his skull and on the right side of his face, a broken nose, and abrasions to his arms, shoulder, and back of his neck. There was so much pressure caused by blood and fluid between his brain and skull, that physicians had to cut two tendons on the side of his eye to relieve the pressure. Goodrich was placed on a morphine drip to prevent seizures and antibiotics to prevent infections. He was released from the hospital on June 2, 2020. About four or five weeks after he was released, he returned to the hospital for removal of staples that were placed in his skull.

At the time of trial, five months after the assault, Goodrich still had blurry eyesight, dizzy spells, and high blood pressure that he did not have before.

**Goodrich's Pretrial Statements**

On May 28, 2020, Officer Gonzales spoke with Goodrich on the telephone about the assault. At that time, Goodrich said that he believed Luna and Webb were having "a

9.

side conversation together" in the picnic area, and "they were saying 'Why hadn't we killed him yet,' " referring to Goodrich. Goodrich said that three subjects hit him with an axe and shovel, and Webb retrieved the shovel and Samaniego retrieved the axe. Goodrich did not mention a sledgehammer. Goodrich said that Luna should have a large cut on his chin.

On June 1, 2020, Officer Gonzales met with Goodrich at the hospital, and testified that Goodrich was hooked up to monitors and IV bottles. Goodrich's right eye was bruised, discolored, swollen, and he could not open it. There were bruises under his left eye. There were staples on a wound on top of his head, and scratches on his arms or upper torso. Gonzales took photographs of Goodrich's injuries, and the pictures were introduced at trial.

On the same day, Officer Gonzales conducted a recorded interview with Goodrich. Goodrich said that he had heard Luna and Webb talking, and the "gist" of their conversation made him "wonder" if they were talking about killing him. Goodrich said that he cut Luna with his knife, and Luna should have a large cut on his chin area. Goodrich said that he jumped on the picnic table as he tried to defend himself. Goodrich also said, " 'They were hitting stuff with their sledgehammers trying to scare me,' " someone hit a picnic table with a sledgehammer, and the table should be damaged. Goodrich said all three men followed him to the parking lot.[2]

---

[2] At trial, Goodrich testified that he never told anyone Samaniego retrieved an axe and Webb separately got a shovel; that there were multiple sledgehammers; that he was hit with a knife; he jumped on top of a table during the fight; he had to fight his way out to escape; all three defendants followed him to the parking lot area; or that any of the defendants threatened members of his family.

Goodrich admitted that during breaks in his trial testimony, he asked the prosecutor about certain aspects of the investigation, but that information did not affect his testimony, and he was not fabricating anything about the assault. While he asked the prosecutor about the case during the breaks, he testified, "[W]hat difference does it make whether who hit me? They were all trying to hit me."

10.

**The Arrests of Defendants and Their Statements**

On June 1, 2020, Officer Gonzales came into contact with Webb at the picnic area where Goodrich was assaulted. Webb was with Samaniego.

On June 2, 2020, Officer Gonzales saw Luna riding a bicycle toward the picnic area. Gonzales was familiar with Luna because he had seen him about a month earlier at the same picnic area when Luna was with Samaniego.

On June 2, 2020, Officer Brian Majors saw Luna riding a bicycle near Millview Middle School. Majors stopped Luna and placed him under arrest because of the investigation in this case. Majors noticed Luna had a cut on his chin and asked him about it. Luna said that he had fallen. Majors searched Luna and asked him if he had any contraband. Luna indicated that he had something in his pocket, and Majors found a white substance that appeared to be crystal methamphetamine.

Also on June 2, 2022, Officer Gonzales met with Luna at the police station, advised him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and Luna agreed to answer questions. Gonzales asked about the cut on his chin. Luna said that he had cut himself in a shaving accident. In response to questions, Luna said that he was known as "Polo," and he knew Goodrich. He denied being in any type of altercation with Goodrich. Luna did not claim that Goodrich used a knife against him or that he had to defend himself against Goodrich.

Detective Gonzales testified that he separately interviewed Webb and Samaniego. In those interviews, both men acknowledged being at the picnic area on the evening of May 28, 2020.

## DEFENSE EVIDENCE

None of the defendants testified. Luna and Samaniego did not introduce any defense evidence.

Webb called Yvette Paul, an investigator for the district attorney's office, as a defense witness. Ms. Paul testified that she contacted Goodrich on September 1, 2020, to

11.

get his consent to obtain his medical records. During this contact, Ms. Paul did not conduct a formal interview or ask any questions, but Goodrich started to talk about the assault. Goodrich said that "he believed the attack was premeditated," and Webb "was waiting for him and that he had a shovel and used that to hit him with." Goodrich said that after the assault, Webb told him not to tell anyone what had happened, or Webb would hurt Goodrich's family. Goodrich said that Webb threatened to kill Goodrich's sister in Visalia, his father and niece in Hanford, and other family members in Santa Barbara.

Goodrich also told Ms. Paul that, at a later date after the assault, he was sitting in a park and near a table, something hit the table and exploded; he thought someone shot at him. Goodrich said that on another day, he was sitting near a tree and heard a loud sound above him, like an explosion, and pieces of the tree fell around him; he thought it was another gunshot. Goodrich was not sure if these incidents had anything to do with the assault or were just coincidental.

## PROCEDURAL BACKGROUND

On October 14, 2020, a first amended information was filed in the Superior Court of Madera County, charging defendants Luna, Webb, and Samaniego with count 1, assault with a deadly weapon (§ 245, subd. (a)(1)), with enhancements as to all three defendants, that they personally inflicted great bodily injury on Goodrich in the commission of the assault (§ 12022.7, subd. (a)). Luna was separately charged in count 2 with misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)).

As to count 1, it was further alleged that Webb and Luna each had one prior strike conviction and one prior serious felony enhancement (§§ 667, subds. (a), (b)–(i), 1170.12).

12.

**Trial and Verdicts**

On October 15, 2020, the joint trial began for the three defendants, with motions and jury selection.

On December 1, 2020, Webb, Luna, and Samaniego were convicted as charged of count 1, assault with a deadly weapon. The jury found true the enhancements attached to count 1, that Webb and Luna personally inflicted great bodily injury.

The jury was unable to reach a finding on the great bodily injury enhancement alleged as to Samaniego. The court declared a mistrial on that enhancement, and it was later dismissed.

Luna was found not guilty of count 2, misdemeanor possession.

**The Court Trial on the Prior Conviction Allegations**

The first amended information alleged that Webb and Luna each had one prior strike conviction and one prior serious felony enhancement, based on Luna's prior conviction for assault with a deadly weapon in 2010 (§ 245, subd. (a)), and Webb's prior conviction for commission of a lewd or lascivious act on a child under the age of 14 years in 1996 (§ 288, subd. (a)).

Luna and Webb waived a jury trial on the special allegations.

On December 4, 2020, the court held a bench trial on the truth of the prior conviction allegations. The prosecutor introduced documentary exhibits consisting of certified copies of abstracts of judgment, and the chronological/movement history for both defendants from the California Department of Corrections and Rehabilitation (CDCR).

The defense attorneys did not object to the exhibits and submitted the matter, and the court admitted the documentary exhibits into evidence. The court found all prior conviction allegations to be true beyond a reasonable doubt for both Luna and Webb.

13.

**Luna's Sentencing Hearing[3]**

On January 15, 2021, the court conducted the sentencing hearing for Luna. The court denied Luna's motion to dismiss the prior serious felony enhancement and imposed an aggregate sentence of 16 years, based on the upper term of four years for assault, doubled to eight years as the second strike term, plus three years for the great bodily injury enhancement, and five years for the serious felony enhancement.

The court imposed a $300 restitution fine (§ 1202.4, subd. (b)), suspended the parole revocation fine in the same amount (§ 1202.45), and ordered victim restitution in an amount to be determined.

The court imposed a total fine of $890 pursuant to section 245, subdivision (a)(1). Both parties waived enumeration of the elements of that fine.

The court imposed a fee of $73 per day for the cost of court-ordered confinement (§ 1203.1, subd. (a)), and a booking fee of $108.19 payable to the City of Madera (Gov. Code, § 29550.2); and granted Luna's motion to strike the felony presentence fee of $750.

**Webb's Sentencing Hearing**

On January 29, 2021, the court conducted Webb's sentencing hearing and denied his request to dismiss the prior strike conviction. As to count 1, assault with a deadly weapon, the court imposed the upper term of four years, doubled to eight years as the second strike sentence, plus consecutive terms of three years for the great bodily injury enhancement and five years for the prior serious felony conviction, for an aggregate sentence of 16 years.

---

[3] In parts IV, V, and VI, *post*, we will address defendants' sentencing hearings in detail, as relevant to their appellate contentions that the court improperly imposed upper terms in violation of Senate Bill 567's amendments to section 1170, subdivision (b).

The court imposed a $300 restitution fine (§ 1202.4, subd. (b)), suspended the parole revocation fine in the same amount (§ 1202.45), and ordered victim restitution in an amount to be determined.

The court imposed a total fine of $890 pursuant to section 245, subdivision (a)(1). Both parties waived enumeration of the elements of that fine.[4]

The court also imposed a $750 felony presentence fee, a fee of $73 per day for the cost of court-ordered confinement (§ 1203.1, subd. (a)), and a booking fee of $108.19 payable to the City of Madera (Gov. Code, § 29550.2).

## CONSOLIDATION OF APPEALS

On January 20 and February 24, 2021, Luna and Webb, respectively, filed timely notices of appeal. Samaniego is not part of the instant appeal.

On August 2, 2021, Webb and Luna jointly moved for consolidation of their appeals.

On August 17, 2021, this court granted the motion and consolidated Webb's appeal with that of Luna under case No. F082309.

**Appellant Contentions**

While we consolidated the appeals, Luna and Webb have filed separate briefs in this case.

In Webb's opening brief, he argued there was insufficient evidence to support the jury's true finding on the great bodily injury enhancement because Goodrich was unable to specify which defendant inflicted which injury upon him. Webb argued the matter must be remanded because the sentencing court failed to enumerate the individual components of the $890 fine and that his credits on the abstract of judgment must be corrected. Webb also joined any issues raised by Luna that are applicable to his case.

---

[4] In part II, *post*, we will address Webb's arguments that the court failed to enumerate this fine.

15.

In Luna's opening brief, he joined Webb's argument that there is insufficient evidence to support the great bodily injury enhancement because of Goodrich's inability to testify as to who inflicted the injuries on him.

Luna filed a supplemental opening brief, and argued remand is required for the court to reconsider imposition of the upper term in light of the enactment of Senate Bill No. 567 (2021–2022 Reg. Sess.).

In Webb's reply brief, he joined Luna's argument that remand is required for the court to reconsider the upper term after the enactment of Senate Bill 567 (2021–2022 Reg. Sess.). Luna filed a reply brief but did not request to join Webb's other appellate arguments.

## DISCUSSION

### I. Substantial Evidence of the Great Bodily Injury Enhancements

Webb and Luna argue there is insufficient evidence to support the jury's true findings on the enhancements that they personally inflicted great bodily injury on Goodrich in the commission of the assault. Webb and Luna acknowledge there was "no real question Goodrich suffered injuries, including some great bodily injuries." They argue, however, there is insufficient evidence to prove which defendant inflicted the blows that actually landed on his face and head, and Goodrich's testimony about the assault was inconsistent and undermined by his prior statements.

#### A. *Substantial Evidence*

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) "[W]e must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence – that is, evidence that is reasonable, credible, and of solid value – supporting

16.

the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358.)

## B.  *Personal Infliction of Great Bodily Injury*

Section 12022.7, subdivision (a) defines the great bodily injury enhancement that the jury found true in this case: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

The phrase "great bodily injury" as used in section 12022.7 is defined as " 'bodily injury which is significant or substantial, not insignificant, trivial or moderate.' [Citation.] '[T]he injury need not be so grave as to cause the victim " 'permanent,' 'prolonged,' or 'protracted' " bodily damage.' " (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 464.) " 'Proof that a victim's bodily injury is "great" – that is, significant or substantial within the meaning of section 12022.7 – is commonly

17.

established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury.' [Citation.] While 'any medical treatment obtained by the victim is relevant to determining the existence of "great bodily injury" [citation], the statutory definition and relevant … instruction … do not require a showing of necessity of medical treatment. Nor are we aware of any case authority imposing such a requirement.' " (*Ibid*.) "[D]etermining whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury." (*People v. Cross* (2008) 45 Cal.4th 58, 64.)

This type of enhancement "arise[s] from the *circumstances of the crime* and typically focus[es] on what the defendant did when the current offense was committed." (*People v. Coronado* (1995) 12 Cal.4th 145, 157; *People v. Ollo* (2021) 11 Cal.5th 682, 687 (*Ollo*).)

The meaning of "personally inflict" as used in section 12022.7 "is clear and unambiguous in the context of injuries resulting from the direct application of physical force. [Citation.] Commonly understood, the term 'personally' refers to 'an act performed "in person," and involving "the actual or immediate presence or action of the individual person himself (as opposed to a substitute, deputy, messenger, etc.)." ' [Citation.] The verb 'to inflict' means ' "to lay (a blow) on: cause (something damaging or painful) to be endured: impose." ' [Citation.] The meaning of the statutory requirement that a defendant personally inflict the victim's injury does not differ from its nonlegal meaning. [Citation.] '[T]he phrase "personally inflicts" means that someone "in person" …, that is, directly and not through an intermediary, "cause[s] something (damaging or painful) to be endured." ' " (*Ollo, supra*, 11 Cal.5th at pp. 687–688.)

## C. *Group Assaults and the Personal Infliction Enhancement*

Defendants do not dispute that Goodrich suffered great bodily injury. They contend, however, there is insufficient evidence that each defendant personally inflicted great bodily injury upon him during the group assault.

18.

"[O]ne who merely aids, abets, or directs another to inflict the physical injury is not subject to the enhanced penalty of section 12022.7." (*People v. Cole* (1982) 31 Cal.3d 568, 571; *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 348–349.)

*Cole* has been repeatedly distinguished in cases where multiple defendants have been convicted of assault, with enhancements found true for the personal infliction of great bodily injury, when there has been a group beating. In *People v. Dominick* (1986) 182 Cal.App.3d 1174, the court upheld a section 12022.7 enhancement for a defendant who did not actually strike the victim, but who grabbed her hair and held her so that she could be hit by another. *Dominick* affirmed the enhancement for personal infliction of great bodily injury because these acts "constituted more than aiding and abetting," and contributed to the great bodily injury the victim suffered. (*Id.* at p. 1211.)

In *People v. Corona* (1989) 213 Cal.App.3d 589 (*Corona*), the court created an express exception to *Cole* in the group beating context. "While *Cole* has logical application with regard to the section 12022.7 culpability of an aider and abettor who strikes no blow, *it makes no sense when applied to a group pummeling*. Central to *Cole* is the conclusion that the deterrent intent of section 12022.7 is served by directing its increased punishment at the actor who ultimately inflicts the injury. Applying *Cole* uncritically in the context of this case does not create a deterrent effect. Rather it would lead to the insulation of individuals who engage in group beatings. Only those whose foot could be traced to a particular kick, whose fist could be patterned to a certain blow or whose weapon could be aligned with a visible injury would be punished. The more severe the beating, the more difficult would be the tracing of culpability." (*Corona,* at p. 594, italics added.)

*Corona* declined to state a "universally applicable test" but held that "when a defendant participates in a group beating and when it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily

19.

injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered." (*Corona, supra*, 213 Cal.App.3d at p. 594.)

The Supreme Court addressed group assaults in *People v. Modiri* (2006) 39 Cal.4th 481 (*Modiri*). In that case, the defendant was at a party and participated in a group attack that left the victim with serious injuries. "The evidence showed that [the] defendant personally applied physical force to the victim several times. However, chaos at the scene prevented witnesses from linking the victim's injuries to a particular assailant, weapon, or blow." (*Id.* at p. 485.) The defendant was convicted of felony assault with a deadly weapon. "To enhance the sentence in any *future* prosecution, the jury sustained an allegation that, in the course of the assault, [the] defendant 'personally inflict[ed] great bodily injury' on the victim. (§ 1192.7, subd. (c)(8) ...." (*Ibid.*)

As to the personal infliction allegation in *Modiri*, the trial court gave CALJIC No. 17.20, that stated the "defendant must personally have inflicted great bodily harm. The same instruction also said that if he participated in a group attack, and jurors could not decide which person inflicted which injury, the allegation could be sustained if [the] defendant personally applied physical force to the victim either (1) of a nature that, 'by itself,' could have caused great bodily injury, or (2) under such circumstances that the 'cumulative effect' of the force used by all participants would have caused the injury." (*Modiri, supra*, 39 Cal.4th at pp. 485–486.)

*Modiri* approvingly cited *Corona* and *Dominick*, held that CALJIC No. 17.20 was a correct statement of the law, and concluded that a defendant, who participated in a group beating, could be found to have personally inflicted great bodily injury on the victim. (*Modiri, supra*, 39 Cal.4th at p. 486.)

> "No instructional error occurred at trial. For 20 years, courts have upheld personal-infliction findings where the defendant physically joins a group attack, and directly applies force to the victim sufficient to inflict, or contribute to the infliction of, great bodily harm. Consistent with the statutory language and the manner in which it has been judicially construed,

20.

*the defendant need not be the sole or definite cause of a specific injury.*
[T]hese group beating principles have been accepted by the Legislature.
CALJIC No. 17.20 duly describes them. A contrary approach would mean
that those who perpetrate mob violence and inflict gratuitous injury would
often evade enhanced punishment." (*Ibid.*, italics added.)

In reaching this conclusion, *Modiri* acknowledged and limited the holding in *Cole*:

"… *Cole* stands for the modest proposition that a defendant personally
inflicts great bodily harm only if there is a direct physical link between his
own act and the victim's injury. Under *Cole,* someone who does not strike
or otherwise personally use force upon the victim does not qualify for
enhanced punishment where the personal infliction of harm is required.
… CALJIC No. 17.20 follows this rule. However, consistent with the
instruction, nothing in *Cole* precludes a person from receiving enhanced
sentencing treatment *where he joins others in actually beating and harming
the victim, and where the precise manner in which he contributes to the
victim's injuries cannot be measured or ascertained.*" (*Modiri, supra*,
39 Cal.4th at p. 495, italics added.)

*Modiri* held that while California's courts have followed *Cole*, "participation in a
group attack may satisfy sections 1192.7[, subdivision] (c)(8) and
12022.7[, subdivision] (a) where the defendant personally uses force against the victim,
and the precise injurious effect is unclear." (*Modiri, supra*, 39 Cal.4th at pp. 495–496.)

*Modiri* recognized two theories where liability may be imposed for personal
infliction of great bodily injury in group beating situations. (*Modiri, supra*, 39 Cal.4th at
p. 496.) In one type of a group beating, "the force personally used by the defendant
during a group attack was serious enough that it may, *by itself*, have caused great bodily
injury, even though the evidence did not show for certain that the defendant's acts alone
perpetrated specific harm or that nobody else injured the victim." (*Ibid.*) In the second
type of group-beating cases, "a personal-infliction finding [was affirmed] where the
physical force the defendant and other persons applied to the victim at the same time
*combined* to cause great bodily harm." (*Ibid.*)

*Modiri* held these two theories, as applied to group beating cases, were sound
because "those who participate directly and substantially in a group beating should not be

immune from a personal-infliction finding for the sole reason that the resulting confusion prevents a showing or determination of this kind." (*Modiri, supra*, 39 Cal.4th at pp. 496–497.)

> "Defendant's contrary view would mean that '[o]nly those whose foot could be traced to a particular kick, whose fist could be patterned to a certain blow or whose weapon could be aligned with a visible injury would be punished. The more severe the beating, the more difficult would be the tracing of culpability.' [Citation.] Under such circumstances, all participants in a group attack who personally caused or contributed to the infliction of harm could conceivably escape enhanced punishment. Given the apparent goal of deterring and punishing gratuitous violence, the drafters of sections 1192.7(c)(8) and 12022.7(a) could not have intended that result." (*Id.* at p. 497, citing *Corona, supra*, 213 Cal.App.3d at p. 594; *Ollo, supra*, 11 Cal.5th at pp. 688–689.)

*Modiri* held CALJIC No. 17.20 reasonably and correctly conveyed the operative legal principles. (*Modiri, supra*, 39 Cal.4th at p. 493)

> "CALJIC No. 17.20 requires jurors to first determine the defendant's guilt of the charged crime. The instruction applies if they then decide that he 'participate[d]' in a group beating, and that 'it is not possible' to determine which assailant inflicted a particular injury. [Citation.] Both prongs of the instruction permit a personal-infliction finding in this instance only if the defendant personally 'appli[es] unlawful physical force' to the victim. [Citation.] CALJIC No. 17.20 makes clear that the physical force personally applied by the defendant must have been sufficient to produce great bodily injury either (1) by itself, or (2) in combination with other assailants. *Both group beating theories exclude persons who merely assist someone else in producing injury, and who do not personally and directly inflict it themselves.*
>
> "It bears emphasis that CALJIC No. 17.20 contemplates acts that contribute substantially to the victim's injured state. By definition, 'force' involves 'power, violence, compulsion, or constraint exerted upon or against a person.' [Citations.] Also, the instruction's group beating theories preclude a section 1192.7[, subdivision] (c)(8) finding where the defendant's conduct 'could [not] have,' or 'would [not have],' caused or contributed to the requisite harm. [Citation.] In light of these qualifications, the defendant's role in both the physical attack and the infliction of great bodily injury *cannot be minor, trivial, or insubstantial.*

22.

The instruction thus does not conflict with the statutory language in the manner [the] defendant suggests." (*Id.* at pp. 493–494, italics added.)

*Modiri* affirmed the jury's finding on the great bodily injury allegation. (*Modiri, supra*, 39 Cal.4th at pp. 486, 501–502.)

> "Here, after initially punching Schon [the victim] in the face, [the] defendant was seen in the group of 10 to 15 people who swarmed and beat Schon after he had been knocked down. The evidence suggested that [the] defendant also struck Schon on the head with bottles during the melee …. However, the violence initiated by [the] defendant and escalated by the group prevented any evidence or determination whether [the] defendant's blows were the exact ones that broke Schon's nose, cut his head, or caused other trauma. *Under CALJIC No. 17.20, a personal-infliction finding could nonetheless be made if [the] defendant personally applied force to the victim, and such force was sufficient to produce grievous bodily harm either alone or in concert with others.* Thus, use of this instruction in the present case followed statutory law, as applied by the courts." (*Id.* at p. 497, italics added.)

In *People v. Dunkerson* (2007) 155 Cal.App.4th 1413 (*Dunkerson*), the defendant was convicted of assault after a group beating, with an enhancement for personally inflicting great bodily injury. On appeal, he argued the court erroneously gave CALCRIM No. 3160, the successor instruction to CALJIC No. 17.20, because it "improperly allowed the jury to find he personally inflicted great bodily injury even though others in the group may have caused the injury." (*Dunkerson,* at p. 1414.)

*Dunkerson* held there was no instructional error because *Modiri* rejected identical arguments "involving CALJIC No. 17.20, which is not materially different from CALCRIM No. 3160 with respect to the issue raised by [the] defendant." (*Dunkerson, supra*, 155 Cal.App.5th at p. 1414.) *Dunkerson* held that CALJIC No. 17.20 and CALCRIM No. 3160 "each provide the jury with the same guidance, allowing the jury to find that the defendant personally inflicted great bodily injury during a group assault where it is impossible to determine which person caused which injury to the victim." (*Dunkerson,* at p. 1418.) As to the specific facts of that case, *Dunkerson* held:

23.

"Even though it might be difficult to link [the victim's] specific injuries to specific blows by [the] defendant, the evidence showed that [the] defendant personally applied physical force to [the victim] several times. When [the defendant's mother] told [the] defendant that [the victim] hit her, [the] defendant was the first to attack [the victim]. During the melee of blows to his head and ribs, it seemed to [the victim] that most of the force was coming from [the] defendant. It was [the] defendant who commanded that the group put [the victim] against the couch. And it was [the] defendant who stayed an extra few seconds after the rest of the group left to deliver eight to 10 more kicks to [the victim's] head." (*Ibid*.)

**D.    *CALCRIM No. 3160***

The jury in this case was instructed with CALCRIM No. 875 on the elements of the charged offense of assault with a deadly weapon, as alleged in count 1.

As relevant to defendants' arguments, the jury was also instructed with CALCRIM No. 3160 on the great bodily injury enhancement and group assaults. This instruction was approved in *Dunkerson* as providing the same guidance as CALJIC No. 17.20, that itself was approved in *Modiri*. As given to the jury in this case, CALCRIM No. 3160 stated:

"If you find the defendants or any of them guilty of the crime charged in Count 1, assault with a deadly weapon, you must then decide whether the People have proved the additional allegation that the defendant personally inflicted great bodily injury upon Kevin Goodrich during the commission of that crime.

" 'Great bodily injury' means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"If you conclude that more than one person assaulted Kevin Goodrich and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on Kevin Goodrich if the People have proved that:

"One, *two or more people acting at the same time assaulting Kevin Goodrich and inflicted great bodily injury on him*;

"Two, *the defendant personally used physical force on Kevin Goodrich during the group assault*;

24.

"And, three, *the amount or type of physical force the defendant used on Kevin Goodrich was enough that it alone could have caused Kevin Goodrich to suffer great bodily injury.*

"*The defendant must have applied substantial force to Kevin Goodrich. If that force could not have caused or contributed to great bodily injury, then it was not substantial.*

"The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Italics added.)

The jury was also instructed with CALCRIM No. 3470, that lawful self-defense or defense of others was a defense to count 1, assault with a deadly weapon; that a defendant was not guilty if he reasonably believed he or someone else was in imminent danger of suffering bodily injury or of being unlawfully touched, that the immediate use of force was necessary, and he used no more force than was reasonably necessary to defend against the danger; that a defendant was not required to retreat and was entitled to stand his ground and defendant himself, if reasonably necessary, to pursue the assailant even if safety could have been achieved by retreating; and the People had the burden to prove beyond a reasonable doubt that defendant did not act in lawful self-defense or defense of others.

### E.    *Closing Arguments*

In his closing argument, the prosecutor reviewed the language of CALCRIM No. 3160 about group assaults, and argued it was applicable because Goodrich testified that the three defendants attacked him simultaneously; the axe, sledgehammer, and shovel were deadly weapons; each defendant had a deadly weapon and used it to assault him; and Goodrich's head and skull injuries constituted great bodily injuries. The prosecutor argued that based on Goodrich's testimony, "being hit with a shovel, being hit with an axe, or being hit with a sledgehammer, all three of those are the type of physical force that were used on him. And those individually and alone could have caused Kevin Goodrich to suffer great bodily injury."

25.

In their separate closing arguments, each defense attorney attacked Goodrich's credibility, his inconsistent statements about the incident, that he was the first person who pulled a knife and cut Luna, and he was the instigator.

Luna's attorney argued that Luna was not guilty because he was engaged in lawful self-defense and, in the alternative, he was only guilty of a simple assault. Webb's attorney argued that he was not guilty because there was no crime, and Webb may have stepped in to help Luna after Goodrich slashed him.

## F. *Defendants' Appellate Arguments*

Webb and Luna agree, for the purposes of this appeal, "that each defendant used a deadly weapon at the time of the assault," and the jury was properly instructed with CALCRIM No. 3160. Webb further agrees there was substantial evidence that he "swung a shovel at Goodrich," and does not dispute that he "swung at Goodrich's head" and "at least of two of [his] swings actually landed on Goodrich's body."

Nevertheless, defendants Luna and Webb argue the great bodily injury enhancements must be stricken because there is "no telling … which defendant struck a substantial blow that actually landed on Goodrich's face and head." They argue that Goodrich's trial testimony was inconsistent about "which weapons were used and by whom during the assault," he could not connect any particular defendant to any weapon and any specific bodily injury, and his testimony changed throughout trial.

Defendants further argue that even in a group assault case, the prosecution must prove beyond a reasonable doubt "that at least one of the defendant's blows were applied to the victim with such substantial force that it alone could have caused the great bodily injury." The prosecution "was never able to establish beyond a reasonable doubt that all three defendants actually landed a blow to Goodrich's face and head area which by itself could have caused the great bodily injuries."

26.

**G.**   *Analysis*

The arguments raised by Luna and Webb are meritless.  CALCRIM No. 3160 correctly stated the elements for an enhancement for personal infliction of great bodily injury during a group assault – that two or more people assaulted Goodrich at the same time and inflicted great bodily injury on him; each defendant personally used physical force during the assault; and each defendant used the amount or type of force that alone could have caused Goodrich to suffer great bodily injury.  The jury was further instructed that each defendant must have applied substantial force to Goodrich and, if that force could not have caused or contributed to great bodily injury, then it was not substantial.

Luna and Webb have conceded Goodrich suffered great bodily injuries as a result of the group assault.  The trial evidence established Goodrich was assaulted by Luna and Webb at the same time, and no one else was present when the defendants converged on him with their weapons.[5]  Goodrich testified that Webb used a metal shovel with a round-nosed spade, and Luna used a steel axe, and each defendant was able to hit him with their weapons.

Goodrich repeatedly and consistently testified the defendants hit him with their weapons, and they hit him "mostly" in his head and upper body – an account consistent with the fractures to Goodrich's skull and the right side of his face.  While he was not sure which defendant inflicted which injuries, he testified that "they were all swinging at me," and he was hit in the face and head multiple times – again, an account completely consistent with suffering a fractured skull and face. When asked to clarify the number of blows, he was certain Luna hit him at least twice with the axe and Webb hit him at least twice with the shovel.  On cross-examination, Goodrich acknowledged he did not have "a

---

[5] We limit our analysis to the evidence about Luna and Webb, since Samaniego is not part of the instant appeal, and the jury did not reach a finding on the great bodily injury enhancement attached to his conviction.

27.

specific count" about the number of blows inflicted by each defendant and his testimony "was an approximation, once to twice."

As set forth in *Modiri* and CALCRIM No. 3160, the jury's true findings on the great bodily injury enhancements for Luna and Webb are supported by substantial evidence. Goodrich was assaulted by defendants, they each had a weapon, an axe found in the picnic area had blood on it, and he suffered a skull fracture and other great bodily injuries to his head and face that required surgery and were consistent with such an assault.

Nevertheless, defendants assert that Goodrich's testimony still lacked specificity to support the enhancements, because he could not state that any of the defendants inflicted a particular blow that would have inflicted great bodily injury to his face or head.[6] As explained in *Midori*, however, such an argument "would mean that '[o]nly those whose foot could be traced to a particular kick, whose fist could be patterned to a certain blow or whose weapon could be aligned with a visible injury would be punished. The more severe the beating, the more difficult would be the tracing of culpability.' [Citation.] Under such circumstances, all participants in a group attack who personally caused or contributed to the infliction of harm could conceivably escape enhanced punishment. Given the apparent goal of deterring and punishing gratuitous violence, the

_____

[6] Defendant states the prosecutor relied on CALCRIM No. 3160 in closing argument when he asserted that while Goodrich could not tell which person hit him where, " 'he did testify that all three hit him and all three hit him in his face and head area.' " Defense counsel now argues, for the first time, that the prosecutor's closing argument "was not supported by the evidence" because the prosecutor was never able to establish beyond a reasonable doubt that "all three defendants actually landed a blow to Goodrich's face and head area which by itself could have caused the great bodily injuries." To the extent that defendants may be raising a claim of prosecutorial misconduct, the issue has been forfeited because there were no objections to this portion of the prosecutor's closing argument. (*People v. Mendoza* (2016) 62 Cal.4th 856, 905.) Moreoever, the prosecutor's argument was fair commentary on Goodrich's trial testimony.

drafters of sections 1192.7[, subdivision] (c)(8) and 12022.7[, subdivision] (a) could not have intended that result." (*Modiri, supra*, 39 Cal.4th at p. 497; *Ollo, supra*, 11 Cal.5th at pp. 688–689.)

Defendants further argue Goodrich's credibility was undermined by his inconsistent statements about the sequence of events during the group assault, each defendant's conduct, the type of weapons that were used, and his own conduct. In reviewing the jury's true findings on enhancements for substantial evidence, " '[i]t is for the trier of fact to consider internal inconsistencies in testimony' [citation], and it is for [the appellate court] when reviewing for substantial evidence to resolve the inconsistencies in favor of the verdict." (*People v. Collins* (2021) 65 Cal.App.5th 333, 345.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Goodrich was subject to extensive cross-examination by the defense attorneys, who cited his inconsistent statements in their closing arguments in support of their assertions that the prosecution failed to prove the truth of the enhancements beyond a reasonable doubt. The jury obviously rejected these defense arguments, including their claims of self-defense. There was nothing physically impossible or inherently improbable in Goodrich's trial testimony.

Goodrich's testimony, viewed in the light most favorable to the judgment and resolving all conflicting inferences in favor of the prosecution, was sufficient for a rational trier of fact to find beyond a reasonable doubt that Luna and Webb personally inflicted great bodily injury on him during the group assault.

## II. The Court's Imposition of the $890 Fine

Webb contends the court improperly imposed the $890 fine at the sentencing hearing without enumerating the individual components of that fine, and defense counsel's waiver of such enumeration does not amount to a forfeiture.

Webb concedes an enumeration of the fine is contained in the minute order and abstract of judgment, and that enumeration is identical to the recommendation in the probation report. Nevertheless, Webb argues the trial court failed to enumerate the amount or cite to the enumeration in the probation report when it imposed the $890 fine at the sentencing hearing, defense counsel could not waive this enumeration, and the matter must be remanded to clarify the statutory basis for the imposition of the $890 fine. As we will explain, Webb's argument is refuted by the record and meritless.[7]

### A. *The Trial Court's Duty to Enumerate Fines*

Webb was convicted of a violation of section 245, subdivision (a)(1), assault with a deadly weapon, which states the punishment shall include imprisonment in state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding $10,000, or by both the fine and imprisonment.

" '[A] fine … is part of the judgment which the abstract must " 'digest or summarize.' " ' " (*People v. High* (2004) 119 Cal.App.4th 1192, 1200 (*High*).) A trial court's failure "to specify the statutory bases for the fine, fees, and penalty assessments imposed" is legal error and may be reviewed on appeal even in the absence of an objection. (*People v. Hartley* (2016) 248 Cal.App.4th 620, 636.)

*High* held that "[a]lthough we recognize that a detailed recitation of all the fees, fines and penalties on the record may be tedious, California law does not authorize shortcuts. *All fines and fees must be set forth in the abstract of judgment.*" (*High, supra*, 119 Cal.App.4th at p. 1200, italics added.)

---

[7] Luna did not join this argument on appeal. As will be explained, such an argument would also be meritless as to Luna.

"The abstract of judgment form used here … provides a number of lines for 'other' financial obligations in addition to those delineated with statutory references on the preprinted form. If the abstract does not specify the amount of each fine, the Department of Corrections cannot fulfill its statutory duty to collect and forward deductions from prisoner wages to the appropriate agency. [Citation.] At a minimum, the inclusion of all fines and fees in the abstract may assist state and local agencies in their collection efforts. [Citation.] Thus, even where the Department of Corrections has no statutory obligation to collect a particular fee …, the fee must be included in the abstract of judgment." (*Ibid*.)

There are several ways for the trial court to perform the duty addressed in *High* to enumerate fines and fees. "A trial court could recite the amount and statutory basis for any base fine and the amounts and statutory bases for any penalty assessments on the record, as *High* suggests should be done. [Citation.] Or, in cases where the amounts and statutory bases for the penalty assessments have been set forth in a probation report, a sentencing memorandum, or some other writing, the court could state the amount and statutory basis for the base fine and make a shorthand reference in its oral pronouncement to 'penalty assessments as set forth in the' probation report, memorandum, or … writing …." (*People v. Hamed* (2013) 221 Cal.App.4th 928, 939–940; *Hartley, supra*, 248 Cal.App.4th at pp. 636–637.) "[T]rial courts frequently orally impose the penalties and surcharge discussed above by a shorthand reference to 'penalty assessments.' The responsibility then falls to the trial court clerk to specify the penalties and surcharge in appropriate amounts in the minutes and, more importantly, the abstract of judgment. This is an acceptable practice." (*People v. Sharret* (2011) 191 Cal.App.4th 859, 864.)

## B.    *The Probation Report*

As relevant to Webb's argument, the probation report recommended the $890 fine as follows:

"$890 Fine per 245(a)(1) PC which consists of:

"$200 Base Fine.

31.

"$340 State and Local Penalty Assessment per 1464 PC & 76000 GC.

"$40 Criminal Surcharge per 1465.7 PC.

"$100 State Court Facility per 70372(a) GC.

"$40 Court Operations Assessment per 1465.8(a) PC ($40 per convicted Charge).

"$100 DNA Penalty Assessment per 76104.6/.7 GC.

"$40 EMS per 76000.5 GC.

"$30 Criminal Conviction Assessment per GC 70373 ($30 per convicted Charge)."

## C. *The Sentencing Hearing*

At Webb's sentencing hearing, the court imposed the restitution fine and then imposed the $890 fine as follows:

"[THE COURT]:      $890 fine pursuant to Penal Code Section 245, subdivision (a), subdivision (1). [¶] Do the People waive enumeration of the elements of that fine?

"[THE PROSECUTOR]:   Yes, Your Honor.

"THE COURT:   Waived by the Defense?

"[WEBB'S COUNSEL]:   So waived."

## D. *The Minute Order*

The minute order for Webb's sentencing hearing stated the court imposed the $890 fine, that defense counsel waived reading the enumeration, and stated the same enumeration and statutory basis for each element of the fine, identical to that contained in the probation report as follows:

"$890 Fine per 245(a)(1) PC, counsel waive reading of the enumeration of the elements of the fine, which consists of:

"$200 Base Fine.

32.

"$340 State and Local Penalty Assessment per 1464 PC & 76000 GC.

"$40 Criminal Surcharge per 1465.7 PC.

"$100 State Court Facility per 70372(a) GC.

"$40 Court Operations Assessment per 1465.8(a) PC ($40 per convicted Charge).

"$100 DNA Penalty Assessment per 76104.6/.7 GC.

"$40 MS per76000.5GC.

"$30 Criminal Conviction Assessment per GC 70373 ($30 per convicted Charge)."

### E.    *The Abstract of Judgment*

Finally, item No. 8 in Webb's abstract of judgment stated the court's order for the $890 fine, and the breakdown and statutory basis for that fine as follows:

"$890 Fine per 245(a)(1) PC which consists of: $200 Base Fine, $340 State and Local Penalty Assessment per 1464 PC & 76000 GC, $40 Criminal Surcharge per 1465.7 PC, $100 State Court Facility per 70372(a) GC, $40 Court Operations Assessment per 1465.8(a) PC ($40 per convicted Charge), $100 DNA Penalty Assessment per 76104.6/.7 GC, $40 EMS per 76000.5 GC and $30 Criminal Conviction Assessment per GC 70373 ($30 per convicted Charge)."

### F.    *Analysis*

On appeal, Webb acknowledges defense counsel waived enumeration of the fine, that the minute order and abstract of judgment enumerate the individual elements of that fine, and those statements are identical to the enumeration in the probation report but insists the matter must be remanded because the court did not expressly refer to the probation report at the sentencing hearing when it asked for the waiver.

We have quoted at length from the record to show that Webb's appellate claim of error completely lacks merit. The probation report recommended imposition of the $890 fine, stated the statutory basis for that fine, and enumerated the amounts and statutory

basis for each individual component of that fine. At Webb's sentencing hearing, the court imposed the $890 fine and expressly asked the prosecutor and defense counsel if they would waive "enumeration of the elements" of that fine. Both attorneys agreed, implying that they were well aware of the nature and substance of the fine recommended in the probation report. The minute order for the sentencing hearing and abstract of judgment stated the court imposed the $890 fine, the statutory basis for that fine, and enumerated the amounts and statutory basis for the individual components of that fine, identical to that contained in the probation report.

Webb has not argued the itemization in the minute order or the abstract were miscalculated or legally unauthorized. Indeed, such an argument cannot be made based on this record. We find the court complied with *High*'s requirement to enumerate the $890 fine imposed in this case.[8]

## III.  Correction of Abstract of Judgment

Webb contends, and the People agree, that at his sentencing hearing on January 29, 2021, the court correctly awarded 242 actual days of custody credit, and 242 days of conduct credits, for a total 484 days of presentence credits.

The parties further agree the abstract of judgment and minute order erroneously state the court awarded 218 actual days of custody credits and 218 days of conduct credits for a total of 436 days of presentence credits.

We will order the minute order and abstract corrected to the credits awarded at the sentencing hearing.

---

[8] We note that Luna has not raised this issue on appeal, and such an argument would be meritless:  Luna's probation report stated that a $890 fine was recommended and contained an enumeration and the statutory authority to impose each element of that fine; the court imposed the $890 fine at Luna's sentencing hearing, and asked for and obtained waivers from the attorneys of the enumeration of the elements; and both the minute order and abstract of judgment for Luna contained the statutory itemization and enumeration for each element of the fine.

We therefore order Webb's abstract of judgment and January 29, 2021, minute order corrected to show the accurate number of credits awarded at the sentencing hearing.

## IV.    Imposition of the Upper Terms

At each of their sentencing hearings, the court sentenced Webb and Luna to the upper term for assault with a deadly weapon.  Webb and Luna argue the matter must be remanded for new sentencing hearings because the court imposed the upper terms based on aggravating circumstances not found true beyond a reasonable doubt as required by Senate Bill 567's amendments to section 1170, subdivision (b).

In this section, we review the applicable law, and then will separately address the court's findings at the sentencing hearings for Webb and Luna.

### A.    *Senate Bill 567*

At the time Webb and Luna were sentenced, "the trial court had broad discretion to determine whether imposition of the lower, middle, or upper term … 'best serve[d] the interests of justice.'  [Citation.]  Consistent with the law at that time, the trial court identified a number of factors in aggravation and no factors in mitigation, and it ultimately chose to impose an upper term sentence … based on these aggravating factors."  (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464, fn. omitted (*Lopez*).)

While defendants' appeal was pending, "[o]n October 8, 2021, Senate Bill 567 was signed into law.  It amended the determinate sentencing law, section 1170, subdivision (b), which delineates the trial court's authority to impose one of three statutory terms of imprisonment, known as the lower, middle, or upper terms, by making the middle term the presumptive sentence for a term of imprisonment, unless certain circumstances exist. [Citations.]  Effective January 1, 2022, under the newly amended law, the trial court may impose an upper term sentence only where there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying all of the aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a

jury or a trial court if the defendant has consented to a court trial. [Citation.] Also, under section 1170, subdivision (b)(3), the trial court, 'may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury.' [Citation.] Under amended section 1170, subdivision (b)(5), the trial court must 'set forth on the record the facts and reasons for choosing the sentence imposed. The court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law.' " (*People v. Dunn* (2022) 81 Cal.App.5th 394, 402 (review granted Oct. 12, 2022, S275655) (*Dunn*).)

In this case, defendants and the People agree that "Senate Bill No. 567's ameliorative amendments to section 1170, subdivision (b) apply retroactively to all cases not yet final as of January 1, 2022." (*Lopez, supra*, 78 Cal.App.5th at p. 465; *Dunn, supra*, 81 Cal.App.5th at p. 403.)

Defendants and the People disagree as to whether remand is required because of the imposition of the upper terms in their cases, and the appropriate standard to determine whether the trial court's reliance on factors not found true beyond a reasonable doubt or stipulated to by defendant constituted harmless error.

**B.** *Harmless Error*

The appellate courts are currently divided on the standard to assess prejudice in cases where the trial court imposed the upper term by relying on aggravating circumstances that were not admitted or found true beyond a reasonable doubt.

In *People v. Flores* (2022) 75 Cal.App.5th 495, Division Three of the First District held a remand for resentencing is unnecessary if " 'a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury.' " (*Id*. at p. 521.)

"On this record we are satisfied, beyond a reasonable doubt, the jury would have found true at least one aggravating circumstance. [The defendant's] probation report, which the court reviewed and considered, identified his five sustained juvenile delinquency petitions and numerous convictions, including battery, as an adult – information that is readily available from official records. [Citation.] The report further established [the defendant's] unsatisfactory performance while on probation – he was on probation when committing the offense against [the victim]." (*Ibid*.)

In *People v. Lopez*, *supra*, 78 Cal.App.5th 459, Division One of the Fourth District Court of Appeal disagreed with *Flores* and held:

"The question of prejudice under retroactive application of the revised triad system involves a two-step process, neither of which includes a determination as to whether the trial court relied on a single, or even a few, permissible factors in selecting an upper term. Rather, under the new version of the triad system set forth in section 1170, the initial relevant question for purposes of determining whether prejudice resulted from failure to apply the new version of the sentencing law is whether the reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term. If the answer to this question is 'yes,' then the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term. However, if the answer to the question is 'no,' we then consider the second question, which is whether a reviewing court can be certain, to the degree required by *People v. Watson* (1956) 46 Cal.2d 818, 836 …, that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied. If the answer to both of these questions is 'no,' then it is clear that remand to the trial court for resentencing is necessary." (*Lopez, supra*, 78 Cal.App.5th at p. 467, fn. 11.)

The harmless error issue is currently pending before the California Supreme Court in *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.] review granted August 10, 2022, S274942, a case that relied on the harmless error standard in *Lopez* and declined to remand the matter.

### 1. Dunn

After review was granted in *Lynch*, a panel of this court articulated a different harmless error standard in *Dunn,* and held the type of error at issue has both federal Constitutional and state law dimensions. (*Dunn, supra,* 81 Cal.App.5th at pp. 408–409.)

> "[W]e think the correct standard for harmless error lies between the standards articulated in *Flores* and *Lopez*; *Flores* sets too low a standard for harmlessness and *Lopez* too high. We instead apply a version of the standard articulated in *Lopez*, modified to incorporate *Watson* in the first step: The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)." (*Id*. at pp. 409–410, fn. omitted.)

The trial court in *Dunn* found three aggravating factors when it imposed the upper term: the defendant's prior convictions were numerous, she was on probation at the time she committed the charged offenses, and her prior probation performance was unsatisfactory. (*Dunn, supra*, 81 Cal.App.5th at p. 403.)

*Dunn* held that the defendant's probation report was not a certified record of conviction under section 1170, subdivision (b)(3) to establish that his prior convictions were numerous. However, during the contested hearing on the defendant's probation violations, the trial court had admitted into evidence "a certified copy of [the] defendant's criminal history report," that constituted a certified record and established the court's first finding, that the defendant had numerous convictions, and met the requirements of section 1170, subdivision (b)(3). (*Dunn*, *supra*, 81 Cal.App.5th at pp. 403–404,

38.

fn. omitted.) "Accordingly, there was no error in the trial court's reliance upon the aggravating circumstance of [the] defendant's numerous prior convictions." (*Ibid*.)

The third aggravating factor was that the defendant's prior performance on probation was poor. *Dunn* held that since the defendant stipulated to probation violations that had been alleged in separate petitions as part of the case, and that she committed a new offense that resulted in another violation, the third aggravating factor met the requirements of section 1170, subdivision (b)(2) "because the facts underlying the aggravating circumstance have been stipulated to by [the] defendant," and "there was no error in the trial court's reliance upon the aggravating circumstance that [the] defendant's prior performance on probation was unsatisfactory." (*Dunn, supra*, 81 Cal.App.5th at p. 404; *ibid*.)

*Dunn* further held the facts underlying the second aggravating circumstance, that the defendant was on probation at the time of the charged offense, "were not admitted by [the] defendant or presented to or found true by the jury as required by section 1170, subdivision (b)(2). Accordingly, as section 1170 requires all aggravating circumstances relied upon by the trial court to meet the requirements of section 1170, subdivision (b)(2) or (3), unless imposition of the upper term on count 1 was harmless, the sentence must be vacated and the matter must be remanded to the trial court for resentencing in compliance with section 1170, subdivision (b)." (*Dunn, supra*, 81 Cal.App.5th at pp. 404–405, fn. omitted.)

*Dunn* applied its standard to the court's findings of aggravating circumstances and found "there was no error as to the first aggravating circumstance, that [the] defendant had numerous convictions, because it met the requirements of section 1170, subdivision (b)(3) permitting the trial court to rely on certified records of [the] defendant's prior convictions. There was also no error, as discussed above, as to the trial court's reliance on the third aggravating circumstance, that [the] defendant's prior performance on probation was unsatisfactory, because [the] defendant admitted two prior

probation violations in this case. These admissions met the requirements of section 1170, subdivision (b)(2), that aggravating circumstances relied upon by the court must be stipulated to by [the] defendant or proven true beyond a reasonable doubt by a jury. Accordingly, we need not determine beyond a reasonable doubt whether the jury would have found any one aggravating circumstance true beyond a reasonable doubt." (*Dunn, supra*, 81 Cal.App.5th at p. 410, fn. omitted.)

*Dunn* turned to the question about "whether there is a reasonable probability that the jury would not have found the remaining aggravating circumstance true beyond a reasonable doubt." (*Dunn, supra*, 81 Cal.App.5th at p. 411.) While the jury did not make a specific finding as to the facts underlying the second aggravating circumstance, that the defendant was on probation at the time the charged offenses were committed, she made admissions at the hearing on probation violations and consisted of a record where "a jury would have assessed the facts underlying the second aggravating circumstance, that [the] defendant was on probation at the time she committed the charged offenses, in the same manner as the trial court. Accordingly, we conclude that there is not a reasonable probability the jury would not have found the remaining aggravating circumstance true beyond a reasonable doubt." (*Ibid*.)

*Dunn* concluded that "[a]s the first and third aggravating circumstances met the requirements of section 1170, subdivision (b)(2) and (3), and there is not a reasonable likelihood the jury would not have found the second aggravating circumstance true beyond a reasonable doubt, the error was harmless." (*Dunn, supra*, 81 Cal.App.5th at p. 411.)

In the absence of guidance from the Supreme Court on this issue, we agree with and apply *Dunn*'s harmless error standard. As applied to this case, we must separately review the court's findings at the sentencing hearings for Luna and Webb, and the evidence and information before the court in each case.

40.

## V.    Imposition of Luna's Upper Term

In determining whether the court properly imposed the upper term for Luna, we review the evidence and information before the court when it considered his sentence, and then apply the factors in *Dunn* to determine harmless error.

### A.    *Luna's Certified Records*

As explained above, the first amended information alleged Luna had both a prior strike conviction and a prior serious felony enhancement based on his prior conviction for assault with a deadly weapon in 2010 (§ 245, subd. (a)).

At the court trial on the prior conviction allegations, the prosecution introduced documentary exhibits, without defense objections, that consisted of certified records of abstracts of judgment, and Luna's chronological/movement history from CDCR.

The certified records of the abstracts of judgment were for Luna's convictions of felony driving under the influence (Veh. Code, § 23152, subd. (b)), where he was sentenced to one year four months in prison in September 2007; felony assault with a deadly weapon (§ 245, subd. (a)(1)), where he was sentenced to four years in prison in October 2010; and felony unlawfully taking or driving a vehicle (Veh. Code, § 10851, subd. (a)), where he was sentenced to two years eight months in prison in December 2014.

The certified records of CDCR's chronological/movement history of Luna's confinement showed that after his felony conviction for driving under the influence, he was delivered to state prison in October 2007, released on parole but returned to custody several times in 2008 and 2009, and again released on parole in November 2009.

These certified records further state that in October 2010, Luna was returned from parole and received at CDCR for a new prison term (corresponding to his conviction and sentence for assault with a deadly weapon). In September 2012, Luna was released on parole, and absconded in November 2012. During 2013 and 2014, Luna was returned to parole but repeatedly absconded again.

Finally, in December 2014, Luna was returned from parole and received at CDCR for a new prison sentence (corresponding to his conviction and sentence for unlawfully taking or driving a vehicle). In April 2016, Luna was released on postrelease community supervision.

**B.** *Luna's Probation Report*

Luna's probation report summarized his criminal record based on information from the databases of the Federal Bureau of Identification (FBI), the California Identification and Investigation Bureau (CIIB), the Department of Motor Vehicles (DMV), and the California Department of Corrections (CDCR), and listed Luna's identification numbers for each department.

According to the probation report, Luna's adult record began in 2002 for misdemeanor driving under the influence (DUI), and he was placed on probation for five years (Veh. Code, § 23152, subd. (b)). On January 15, 2003, Luna was found in violation of probation in this case, and probation was extended for five years.

On February 18, 2003, Luna was convicted of misdemeanor forgery (§ 470) and sentenced to 365 days in jail.

On August 2, 2004, Luna was again convicted of misdemeanor driving under the influence and placed on probation for five years.

On November 10, 2004, Luna was convicted of misdemeanor taking or driving a vehicle (Veh. Code, § 10851, subd. (a)) and placed on probation for three years. As a result of that conviction, his probation was extended for three years for his DUI conviction from 2002, and five years for his misdemeanor DUI conviction from 2004.

On January 4, 2006, Luna was convicted of misdemeanor disturbing the peace (§ 415(2)) and placed on probation for one year.

On November 15, 2006, Luna violated probation in his misdemeanor DUI conviction from August 2004, and probation was terminated.

On June 6, 2007, Luna was convicted of felony DUI, his prison sentence of three years was suspended, and he was placed on probation for three years; he was also convicted of misdemeanor DUI and received jail time. As a result of these convictions, Luna was found in violation of probation in his misdemeanor DUI case from 2002.

On September 28, 2007, Luna violated probation in his 2006 felony DUI case, probation was revoked, and he was sentenced to 16 months in prison. In 2008 and 2009, Luna repeatedly violated parole and was returned to prison to complete his term.

On October 6, 2010, Luna was convicted of felony assault with a deadly weapon (§ 245, subd. (a)) and sentenced to four years in prison. This conviction was alleged as both the prior strike conviction and the prior serious felony enhancement in this case.

On December 10, 2014, Luna was convicted of felony taking or driving a vehicle (Veh. Code, § 10851, subd. (a)) and sentenced to 32 months in state prison; he was also convicted of misdemeanor possession and sentenced to jail (Health & Saf. Code, § 11377, subd. (a)).

In 2016, Luna's postrelease community supervision was revoked (§ 3455) and he served jail time.

### 1. The Probation Report's Recommendations

The probation report stated Luna was statutorily ineligible for probation because of his prior strike conviction (§ 667, subd. (e)(1)). The probation report next stated the following criteria affecting probation pursuant to specific subdivisions of California Rules of Court,[9] rule 4.414: (a)(1) the facts relating to the case, based on a summary of the trial evidence; (a)(2) Luna was armed with and used a weapon; (a)(3) the victim was particularly vulnerable as he was outnumbered three to one; (a)(4) Luna inflicted physical injury on the victim; (a)(6) Luna was an active participant in the commission of the crime; (b)(1) Luna had a significant record of criminal conduct; (b)(2) his prior

---

[9] All further references to rules are to the California Rules of Court unless otherwise indicated.

performance on probation and parole was unsatisfactory; (b)(3) he had not expressed a willingness to comply with probation; (b)(4) his inability to comply with probation is indicated by his lack of stable housing, lack of employment, and drug use; (b)(5) imprisonment will have no likely effect on the defendant and he does not have custody of his dependents; (b)(6) a felony conviction will have no effect on him; (b)(7) he had not expressed remorse for his actions; and (b)(8) he was likely a danger to the community if not imprisoned as evidenced by the instant offense.

The probation report listed the following circumstances in aggravation pursuant to rule 4.421: Luna's prior convictions are numerous, he had served a prior prison term, and his prior performance on probation and parole was unsatisfactory. The report further stated that under rule 4.423, there were no circumstances in mitigation.

The probation report concluded that the circumstances in aggravation preponderate, and recommended imposition of the upper term for the assault conviction, for an aggregate term of 16 years.

## C. *Luna's Sentencing Hearing*

On January 15, 2021, the court conducted the sentencing hearing for Luna.

Defense counsel stated Luna was very remorseful and wanted to apologize to the victim and his family. Counsel stated the incident happened because of his addiction; he was not able to get into a program at the time because of COVID-19 and had to live in the park; and used bad judgment because of his addiction. Counsel asked the court to dismiss the five-year enhancement for the prior serious felony conviction, that would still result in an 11-year sentence which would be significant.

Defense counsel asked the court to strike the $750 presentence report fee that was recommended in the probation report, because he would have trouble paying that amount if he received a long sentence. Defense counsel did not object or request any corrections to the probation report.

The prosecutor replied that the court should impose 16 years as recommended in the probation report because Luna had not shown any remorse or taken responsibility for his actions.

### 1. Imposition of Sentence

The court stated it had read the probation report and made the following findings.

"I will note under … Section 667, subdivision (e), subdivision (i) [*sic*], the defendant is statutorily ineligible for probation.

"The defendant was armed with and used a weapon during the course of the perpetration of the crime for which he's been convicted. The victim was vulnerable, as he was outnumbered; there were three assailants to the one victim. The defendant inflicted physical injury on the victim and was an active participant in the commission of the crime.

"Mr. Luna has a significant record of criminal conduct. His prior performance on probation and parole was unsatisfactory.

"Until today, the defendant had not expressed remorse. I have in mind, however, the statements on his behalf by [Luna's defense attorney] made here today in that regard.

"And I will note that the defendant is likely a danger to the community if not imprisoned, based upon the activity of the instant offense.

"*By way of circumstances in aggravation, the defendant's prior convictions are numerous. He has served a prior prison term. His prior performance on probation and parole was unsatisfactory.*

"*Under Rule 4.423, I do not find circumstances in mitigation applicable in this matter.*" (Italics added.)

The court denied Luna's motion to dismiss the prior serious felony enhancement because it found "under the circumstances of the particular offense and the status of [Luna] in his history here, the consecutive enhancement is appropriate."

The court imposed an aggregate term of 16 years based on the upper term of four years for assault, doubled to eight years as the second strike sentence; plus three years for

the great bodily injury enhancement and five years for the prior serious felony enhancement.

**D.** *The Nature of the Court's Findings at the Sentencing Hearing*

We first note the court made numerous findings before it imposed sentence and did not expressly clarify whether these findings were related to whether Luna was suitable for probation or consisted of aggravating circumstances to impose the determinate term.

By comparing the court's findings to the Rules of Court (along with recommendations in the probation report), however, it is clear the court's initial findings were pursuant to rule 4.414 and addressed criteria against a grant of probation, based upon the facts of the crime, that he was armed with and used a weapon, the victim was vulnerable and outnumbered, defendant inflicted physical injury on the victim, defendant was an active participant in the crime, he had a significant record of criminal conduct, his prior performance on probation and parole was unsatisfactory, and he was a danger to the community if not imprisoned. The probation report also stated defendant did not express any remorse under rule 4.414 (b)(7), but the court acknowledged defense counsel had done so on his behalf at the sentencing hearing

The court then addressed the aggravating circumstances under rule 4.421 for imposition of the determinate term: (1) Luna's prior convictions were numerous; (2) he served a prior prison term; and (3) his prior performance on probation and parole was unsatisfactory. The court stated there were no mitigating circumstances.

We thus turn to whether the court imposed the upper term consistent with the amended version of section 1170, subdivision (b).

**E.** *Compliance with Section 1170, Subdivision (b)*

As explained in part IV, *ante*, under the amended version of section 1170, subdivision (b)(2), the court may impose an upper term sentence only where there are circumstances in aggravation that justify the imposition of a term of imprisonment

exceeding the middle term and the facts underlying all the aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or by the judge in a court trial. (§ 1170, subd. (b)(2).)

Also as discussed above, subdivision (b)(3) states an exception to this provision, that "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury...." (§ 1170, subd. (b)(3).) Subdivision (b)(5) states a limitation to this exception, that the court "may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law...." (§ 1170, subd. (b)(5).)

Our first consideration is whether the aggravating circumstances relied upon the trial court were proved in compliance with section 1170, subdivisions (b)(2) or (b)(3). None of these aggravating circumstances were proved to a jury or admitted by Luna. However, the exception stated in subdivision (b)(2) applies to two of the court's three findings.

### 1. First Aggravating Circumstance

The first aggravating circumstance was that Luna had numerous prior convictions. The court held a bench trial on the truth of the prior conviction allegations and admitted, without objection, certified records of abstracts of judgment of Luna's prior convictions. One abstract was for his assault conviction in 2010. Luna's 2010 conviction, however, cannot be relied upon to impose an upper term since it was the basis to impose both his second strike sentence and the five-year prior serious felony enhancement in this case. (§ 1170, subd. (b)(5).)

However, the certified records also included abstracts of judgments for Luna's additional felony convictions: driving under the influence in 2007 and unlawfully taking or driving a vehicle in 2014.

47.

The first circumstance in aggravation was thus proved in compliance with certified records pursuant to section 1170, subdivision (b)(3) – that he had prior felony convictions.

## 2. Second Aggravating Circumstance

The second aggravating circumstance was that Luna served a prior prison term. The certified records showed that he served three prior prison terms: for driving under the influence in 2007, a separate term for his assault conviction in 2010, and another term for unlawfully taking or driving a vehicle in 2014.

The second circumstance in aggravation was proved in compliance with certified records pursuant to section 1170, subdivision (b)(3).

## 3. Third Aggravating Circumstance

The third aggravating circumstance was that Luna's prior performance on probation and parole was unsatisfactory. Luna did not admit, and the jury did not find, facts relating to this finding.

The certified records introduced at the bench trial on the prior conviction allegations included CDCR's chronological/movement history of Luna's confinement. These records showed that after his felony conviction for driving under the influence, he was delivered to state prison in October 2007, released on parole but returned to custody several times in 2008 and 2009, and again released on parole in November 2009.

These certified records further state that in October 2010, Luna was returned from parole and received at CDCR for a new prison term (corresponding to his conviction and sentence for assault with a deadly weapon). In September 2012, Luna was released on parole, and absconded in November 2012. During 2013 and 2014, Luna was returned to parole but repeatedly absconded.

Finally, in December 2014, Luna was returned from parole and received at CDCR for a new prison sentence (corresponding to his conviction and sentence for unlawfully

taking or driving a vehicle). In April 2016, Luna was released on postrelease community supervision.

It could be argued that the certified "chrono" records showed his numerous violations of parole. As will be discussed below, there is additional information in the record to address this factor.

**F.** *Harmless Error*

The first and second aggravating circumstances were proved in compliance with section 1170, subdivisions (b)(2) and (b)(3). To the extent the third circumstance was not proven, we next determine whether the error was harmless.

In doing so, we apply *Dunn*'s standard for harmless error. "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)." (*Dunn, supra*, 81 Cal.App.5th at pp. 409–410, fn. omitted.)

Since we have found the first and second aggravating circumstances were proved in compliance with section 1170, subdivisions (b)(2) and (b)(3), we need only address *Dunn*'s factor (1)(b) – whether there is a reasonable probability that the jury would have found the remaining aggravating circumstance true beyond a reasonable doubt – that Luna's prior performance on probation and parole was unsatisfactory.

49.

In addition to the certified records of Luna's "chrono," the probation report also set forth Luna's lengthy criminal record of his numerous felony and misdemeanor convictions, and violations of probation and parole. As discussed above, the probation officer listed the state and federal databases, and Luna's identification numbers within each, which served as sources of information for Luna's violations of probation, parole, and mandatory supervision. Luna did not object to the accuracy of these records, and there was no logical reason that he would not have done so if any portion was erroneous or incorrect.

As in *Dunn*, we have no difficulty concluding "there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt." (*Dunn, supra*, 81 Cal.App.5th at pp. 409–410.) Since the three aggravating circumstances relied upon by the court would have been proved to the respective standards, we need not reach the second part of *Dunn*'s analysis, and any error imposing the upper term under section 1170, subdivision (b)(2) was harmless, and remand is not required. (*Ibid.*)

## VI. Imposition of Webb's Sentence

We next turn to the evidence and information before the court when it imposed the upper term for Webb.

### A. *The Certified Records*

The first amended information alleged Webb had both a prior strike conviction and a prior serious felony enhancement based on his conviction for commission of a lewd or lascivious act on a child under the age of 14 years in 1996 (§ 288, subd. (a)).

At the court trial on the prior conviction allegations, the prosecution introduced documentary exhibits, without defense objections, that consisted of certified records of Webb's prior conviction and his chronological/movement history from CDCR.

There was one certified record of an abstract of judgment, for Webb's conviction of felony commission of a lewd act on a child under the age of 14 years, resulting from a

50.

plea in 1996 (§ 288, subd. (a)), further stating that in December 2002, he was sentenced to six years in prison.

The certified records of CDCR's chronological/movement history of Webb's confinement showed in December 2002, he was received by CDCR for his felony commitment. Webb was released on parole on December 16, 2007, absconded two days later, and returned to custody on December 24, 2007. He was released in 2011 after serving the statutory maximum term.

## B. *Webb's Probation Report*

Webb's probation report summarized his criminal record based on information from the databases of the FBI, CIIB, DMV, and CDCR, and listed defendant's identification numbers for each department.

Webb's adult record began in 1996, when he was convicted of committing a lewd or lascivious act upon a child under the act of 14 years (§ 288, subd. (a)); this was the prior conviction alleged as the strike offense and the prior serious felony enhancement in the instant case. According to the probation report, Webb was initially placed on probation for five years and sentenced to one year in jail in 1996. He violated probation in 2002, he was sentenced to six years in prison, and later released on parole. In 2007, Webb violated parole and returned to prison to complete his term.

In November 2011, Webb was convicted of misdemeanor failing to register as a sex offender (§ 290.11, subd. (a)) and placed on probation for three years.

On June 28, 2012, Webb was convicted of two misdemeanors: giving a false name to an officer (§ 148.9, subd. (a)), and failing to register, ordered to serve jail time, and placed on probation for three years. As a result of these convictions, he was found in violation of probation in his 2011 conviction for failing to register, sentenced to five days in jail, and probation was reinstated.

On October 2, 2013, Webb was convicted of felony failing to register (§ 290.011, subd. (a)) and sentenced to 32 months in prison. As a result of this felony conviction, the

51.

grants of probation were terminated in his 2011 conviction for failing to register, and his 2012 convictions for giving a false name and failing to register, and jail terms were imposed.

On November 20, 2017, Webb was convicted of misdemeanor willful infliction of corporal injury to a spouse or cohabitant (§ 273.5, subd. (a)) and placed on probation for three years.

On January 9, 2018, Webb was convicted of misdemeanor intentionally violating a protective order (§ 273.6, subd. (a)) and placed on probation for three years. As a result of this conviction, he violated probation in his 2017 conviction for infliction of corporal injury, ordered to serve time in jail, and probation was reinstated.

On May 18, 2018, Webb violated probation in his 2017 conviction for infliction of corporal injury, ordered to serve jail time, and probation was reinstated. On July 5, 2018, Webb again violated probation in his 2017 case, probation was not reinstated, and he was ordered to serve jail time.

On August 31, 2018, Webb was convicted of misdemeanor battery (§ 242) and placed on probation for three years. As a result of this conviction, he violated probation in his 2018 case for violating a protective order, a jail term was imposed, and probation reinstated. On September 21, 2020, he again violated probation in his 2018 conviction for violating a protective order, probation was not reinstated, and he was ordered to serve jail time.

### 1.    The Probation Report's Recommendations

Webb's probation report stated he was statutorily ineligible for probation because of his prior strike conviction (§ 667, subd. (e)(1)). The probation report next stated the following criteria affecting probation pursuant to specific subdivisions of rule 4.414: (a)(1) the facts of the crime, based on a summary of the evidence; (a)(2) defendant was armed with and used a weapon; (a)(3) the victim was particularly vulnerable as he was outnumbered three to one; (a)(4) defendant inflicted physical injury on the victim; (a)(6)

52.

defendant was an active participant in the commission of the crime; (b)(1) defendant had a significant record of criminal conduct; (b)(2) his prior performance on probation and parole was unsatisfactory; (b)(3) defendant has not expressed a willingness to comply with probation; (b)(4) there are no indications defendant could comply with probation, indicated by his lack of stable housing, education, and employment, and his drug use; (b)(5) imprisonment will have no likely effect on defendant and he does not have custody of dependents; (b)(6) a felony conviction will have no effect on the defendant; (b)(7) defendant has not expressed remorse for his actions; and (b)(8) defendant is considered a danger to the community if not imprisoned.

The probation report stated the following "Circumstances in Aggravation" pursuant to rule 4.421: Webb's prior convictions were numerous, he served a prior prison term, and his prior performance on probation and parole was unsatisfactory. There were no mitigating circumstances under rule 4.423.

The probation report concluded that Webb was statutorily ineligible and not a proper candidate for probation; the circumstances in aggravation preponderated; and the aggravated term in state prison was appropriate and recommended an aggregate term of 16 years.

### C. *Webb's Sentencing Statement*

On January 20, 2021, Webb filed a sentencing statement and argued there were several mitigating factors relating to the crime: he was a passive participant or played a minor role; the victim was the initiator, willing participant, or aggressor of the incident; the incident occurred because of the victim's great provocation by pulling a knife; Webb's conduct was excusable because of the victim's provocation; Webb was not the instigator, and induced by Luna and Samaniego to participate; he exercised caution to avoid harm to the victim, because the incident ended once the victim was disarmed; and the victim engaged in abusive conduct by waving a knife at Webb.

53.

Webb argued there were further mitigating circumstances because his prior strike conviction was 25 years old, his subsequent assault and battery convictions were misdemeanors, Webb cooperated with officers and tried to enter a plea in this case, but an agreement could not be reached, and he was a transient with limited resources who was forced to defend himself from the victim.

Webb also filed a request to dismiss his prior strike conviction for violating section 288, subdivision (a) in 1986, commission of a lewd and lascivious act against a child under the age of 14 years. Webb argued it occurred 25 years ago, it had no relationship to the nature of the instant conviction, his current conviction was mitigated by the victim's provocation and use of a deadly weapon, and Webb was not the instigator and played a minor role.

**D.** *Sentencing Hearing*

On January 29, 2021, the court conducted Webb's sentencing hearing and heard arguments on his sentencing motions.

**1.      Denial of Request to Dismiss the Prior Strike Conviction**

The prosecutor opposed Webb's request to dismiss the prior strike conviction for child molestation because the prior offense was a serious and violent crime, he served a substantial period of time in prison, he had 11 separate violations of probation, he was convicted of two misdemeanors and one felony conviction for failing to register as a sex offender, he had convictions for domestic violence, battery, and violating restraining orders for domestic violence, and his current conviction was also a serious and violent felony offense.

Defense counsel replied that Webb's probation violations were "technical," his criminal history was fairly minor aside from the prior strike conviction, and the misdemeanor convictions were for traffic offenses, drug possession, and domestic violence cases.

The court denied Webb's request to dismiss the prior strike conviction because he had "a history of failing to comply with terms of his probation. He has presented himself as a danger by way of the current offense."

## 2. Arguments About the Sentence

Defense counsel asked the court to consider the mitigating factors in Webb's sentencing statement because he was a passive participant, he did not instigate the crime, he did not become involved until the victim pulled a knife, the victim admitted he reacted because he felted "baited," the victim provoked Webb into defending himself and his friends, and Webb was forced to act.

Defense counsel argued that the upper term would be inappropriate because Webb should not receive the same sentence as Luna, since the trial evidence showed Luna was the instigator and more culpable, Webb was merely an "observer" who "only interacted after things had escalated," and Webb acted in self-defense. Defense counsel added that Webb attempted to resolve his case without going to trial, but the People only offered a "package deal" that did not work out.

Defense counsel asked the court to also strike the five-year prior serious felony conviction enhancement and impose the lower or midterm based on the mitigating circumstances.

The prosecutor replied that defense counsel's version of the trial evidence was "wholly inaccurate," and his sentencing arguments were based on "ostensibly the same strategy deployed during the trial that was rejected by the jury that [Webb] was acting in self-defense, that he was provoked or he was otherwise trying to protect his friends who are also co-defendants found guilty." The prosecutor argued the jury found Webb was a "significant participant" because it found the personally infliction enhancement true, and the court should impose the recommended sentence of 16 years.

Defense counsel responded the jury had a difficult time reaching a verdict as to whether Webb was guilty of assault or he acted in self-defense, that was not because they

55.

were having a hard time determining mitigating circumstances, and the jury's guilty verdict "doesn't preclude Mr. Webb from arguing for mitigating factors for sentencing."

The prosecutor replied that the jury's difficulties during deliberations was based on its inability to reach a finding on the great bodily injury enhancement alleged as to Samaniego. There was no evidence the jury was unable to decide or had any difficulty reaching a verdict as to Webb.[10]

### 3.     Imposition of Sentence

The court rejected Webb's arguments about the alleged mitigating circumstances and found Webb's current conviction was for a serious and violent offense, his self-defense claims were rejected by the jury, he had the opportunity to walk away from what happened, he was not compelled to participate in the assault but elected to do so, and his involvement was not passive.

The court imposed sentence as follows:

"[Webb] is statutorily ineligible for probation under [section] … 667(e)(1).

"With regard to the facts of the circumstance, it took place in a public park at night. The defendant, Mr. Webb, chose to participate with two associates in the attack on the victim in this matter.

"The prior convictions of Mr. Webb are numerous. He has served a prior prison term. His prior performance on probation or parole was unsatisfactory.

"And in considering factors in mitigation, I do not find mitigating factors as to the history or activity of Mr. Webb. He has a prior record of criminal conduct which is significant.

"His prior performance on probation or parole was unsatisfactory. He has not expressed a willingness to comply with probation. There appear to be indications that he would be able to comply; his inability to comply

---

[10] As stated by the prosecutor and explained above, the jury advised the court that it was unable to reach a finding on the great bodily injury enhancement as to Samaniego, and the court declared a mistrial and the enhancement was later dismissed.

indicated by his lack of stable housing, lack of education, lack of employment, and drug use. And the defendant would be considered a danger to the community if not imprisoned. [¶] So based upon the foregoing, the Court intends to impose the following...."

For count 1, assault with a deadly weapon, the court imposed the aggravated term of four years, doubled to eight years as the second strike sentence, plus consecutive terms of three years for the great bodily injury enhancement and five years for the prior serious felony conviction, for an aggregate sentence of 16 years.

## E. *The Nature of the Court's Findings at the Sentencing Hearing*

As with Luna's sentencing hearing, the court made numerous findings before it imposed Webb's sentence but did not expressly clarify whether these findings were related to Webb's suitability for probation or consisted of aggravating circumstances to impose the determinate term.

Again, a comparison of the court's findings to the Rules of Court (along with recommendations in the probation report) clarifies that the court's initial findings addressed probation criteria under rule 4.414 – the facts related to the crime; it took place in a public park at night; Webb chose to participate with two associates to attack the victim; his prior performance on probation or parole was unsatisfactory; he had not expressed a willingness to comply with probations; his inability to comply was based on his lack of stable housing, education, employment, and his drug use; he would be considered a danger to the community if not imprisoned; and he had a prior record of criminal conduct that was significant.

The rest of the court's findings addressed the aggravating circumstances under rule 4.421 for imposition of the determinate term: "The prior convictions of Mr. Webb are numerous. He has served a prior prison term. His prior performance on probation or parole was unsatisfactory." The court found no mitigating factors.

We thus turn to whether the court imposed the upper term consistent with the amended version of section 1170, subdivision (b).

**F.** *Compliance with Section 1170, Subdivision (b)*

Our first consideration is whether the aggravating circumstances relied upon the trial court were proved in compliance with section 1170, subdivisions (b)(2) or (b)(3). None of these aggravating circumstances were proved to a jury or admitted by Luna, as required by subdivision (b)(2). We thus turn to whether the exception in subdivision (b)(3) applies.

### 1. First Aggravating Circumstance

The first aggravating circumstance was that Webb had numerous prior convictions. Webb did not admit, and the jury did not find, that he had numerous prior convictions.

As in Luna, the court held a bench trial on the truth of the prior conviction allegations against Webb. As discussed above, the court admitted certified records but only contained an abstract of judgment for Webb's felony conviction for commission of a lewd and lascivious act in 1996 (§ 288, subd. (a)). This conviction was the basis to impose both his second strike sentence and the five-year enhancement, and cannot be relied on as an aggravating circumstance to impose an upper term (§ 1170, subd. (b)(5)). There were no other certified records of Webb's prior convictions.

The first aggravating circumstance was not proved in compliance with section 1170, subdivisions (b)(2) and (b)(3).

### 2. Second Aggravating Circumstance

The second aggravating circumstance was that Webb served a prior prison term. Webb did not admit, and the jury did not find, that he served a prior prison term.

Section 1170, subdivision (b)(3) states "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury…." The certified record of Webb's abstract of judgment for his 1996 conviction for violating section 288, subdivision (a) states that he was sentenced to six years in state prison. While section 1170, subdivision

(b)(5) states the limitation that the court "may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law," the prior prison term attached to Webb's prior strike conviction in 1996 was not used to enhance his sentence in this case in any way.

The second circumstance in aggravation was proved in compliance with certified records pursuant to section 1170, subdivision (b)(3).

### 3. The Third Aggravating Circumstance

The third aggravating circumstance was that Webb's prior performance on probation and parole was poor. Webb did not admit, and the jury did not find, that his performance on probation and/or parole had been unsatisfactory. None of the certified records addressed Webb's probation and/or parole violations.

### G. *Harmless Error*

The second aggravating circumstance – that Webb served a prior prison term – was proved in compliance with section 1170, subdivisions (b)(2) and (b)(3), but not the first and third circumstances. We next determine whether the error as to these two circumstances was harmless under *Dunn.*

Since we have found the second aggravating circumstance was proved in compliance with section 1170, subdivisions (b)(2) and (b)(3), we need only address *Dunn*'s factor (1)(b), whether there is a reasonable probability that the jury would have found the first and third aggravating circumstances true beyond a reasonable doubt – that Webb had numerous prior convictions, and his prior performance on probation and parole was unsatisfactory.

In contrast to the certified records, the probation report recounted Webb's lengthy adult criminal records of prior misdemeanor convictions and probation violations. As set forth above, the probation officer listed the federal and state databases, and Webb's identification numbers within each, which served as sources of information for the lengthy list of Webb's additional prior convictions and history of probation violations.

At the sentencing hearing, Webb argued there were additional mitigating factors to support imposition of the lower or midterm, and the court rejected that argument. In his sentencing statement and arguments at the hearing, however, Webb did not dispute the accuracy of the probation report's detailed recitation of his prior convictions and his numerous probation violations. There is no logical reason Webb would not have challenged his record of convictions and probation history if they had not been true.

As in *Dunn*, we have no difficulty concluding "there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt." (*Dunn, supra*, 81 Cal.App.5th at pp. 409–410.) Since all aggravating circumstances relied upon by the court would have been proved to the respective standards, we need not reach the second part of *Dunn*'s analysis, and any error imposing the upper term under section 1170, subdivision (b)(2) was harmless, and remand is not required. (*Dunn,* at pp. 409–410.)

If section 1170, subdivision (b)(5) prohibits reliance on the abstract of judgment from Webb's prior strike and prior serious felony enhancement to establish his single prior prison term, then there would be no evidence to support the second aggravating circumstance – that Webb had served a prior prison term. In evaluating the remaining two aggravating circumstances, however, we would still find any error in imposing the upper term was harmless because under *Dunn*'s factor (1)(a), the jury would have found true beyond the reasonable doubt the first aggravating circumstance – that Webb had numerous prior convictions based on the probation report's recitation of his criminal record; and under *Dunn*'s factor (1)(b), there was a reasonable possibility the jury would have found true the remaining aggravating circumstance – that his prior performance on probation was unsatisfactory.

Since the court found no mitigating circumstances, under *Dunn*'s factor (2), there is no reasonable probability that the trial court would have imposed a sentence other than

the upper term in light of the two aggravating circumstances provable from the record as determined in the prior steps. (*Dunn, supra*, 81 Cal.App.5th at pp. 409–410.)

## DISPOSITION

As to Luna, the judgment is affirmed.

As to Webb, the abstract of judgment and the January 29, 2021, minute order are ordered corrected to state that the court awarded him 242 actual days of custody credit, and 242 days of conduct credits, for a total 484 days of presentence credits. The trial court shall prepare and forward to all appropriate parties a certified copy of an amended abstract of judgment.

As modified, the judgment as to Webb is affirmed in all other respects.

POOCHIGIAN, Acting P. J.

WE CONCUR:

DETJEN, J.

SNAUFFER, J.

61.